TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division

Patrick Burns (Nev. Bar No. 11779)
Mahana K. Weidler (MD Bar (NBN))
Trial Attorneys
Criminal Division, Tax Section
Department of Justice
      950 Pennsylvania Avenue NW
      Washington, D.C. 20530-0001
      Telephone: (202) 514-5762
      Facsimile: (202) 514-9623
      E-mail:  J.Patrick.Burns@usdoj.gov
               Mahana.K.Weidler@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 2:25-cr-00641-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S "MOTION TO REVOKE OR AMEND MAGISTRATE JUDGE'S DETENTION ORDER PURSUANT TO 18 U.S.C. § 3145(b)" (ECF. No. 60) |
| v. | |
| MELVIN LOUIS HUGHES, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, Patrick Burns and Mahana K. Weidler, Trial Attorneys, Department of Justice, Criminal Division, Tax Section, hereby files this Government' Response In Opposition To Defendant's "Motion To Revoke Or Amend Magistrate Judge's Detention Order Pursuant TO 18 U.S.C. § 3145(b)" (ECF. No. 60).

**TABLE OF CONTENTS**

DESCRIPTION                                                                      PAGE

I.    Introduction............................................................................................1

II.   Legal Standard.......................................................................................1

III.  Because Defendant Poses a Serious Risk of Flight
      and is a Danger to the Community Pretrial Detention is
      Warranted..............................................................................................3

      a. Nature and Circumstances of Defendant's Criminal
         Conduct...........................................................................................3

      b. Defendant Poses a Serious Risk of Flight Due to His
         Persistent Disregard of Court Authority, Multiple
         Passports and Aliases, Lack of Meaningful Employment
         and Community Ties, Unknown Assets, and Extensive
         International Travel.......................................................................9

            i.   Defendant's History of Disobeying and
                 Disregarding Federal Court Orders.............................10

           ii.   Defendant's Extensive International Travel, Use
                 of Aliases, and Multiple Passports.............................15

          iii.   Defendant's Lack of Employment, Income Sources,
                 Verifiable Assets, or Financial Ties to the
                 Community........................................................................18

           iv.   Defendant's Lack of Meaningful Familial Ties and
                 Potential Third-Party Custodians..............................20

      c. Defendant Poses a Significant Risk of Witness
         Dissuasion and Obstruction if Released..............................24

      d. The Evidence of Defendant's Guilt is Overwhelming, and
         the Sentencing Guidelines Recommend a Lengthy Term of
         Imprisonment................................................................................27

      e. Defendant's Unrelated Criminal History is Serious,
         Extensive, and Continuous......................................................29

      f. Defendant's Alleged High Blood Pressure Problem Does
         Not Warrant His Release...........................................................36

IV.   Conclusion.............................................................................................39

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction.

Defendant Melvin Louis Hughes is a career criminal and sovereign citizen who orchestrated a false tax return scheme costing the United States Treasury $13 million. Because he poses a serious flight risk and is not otherwise amenable to pretrial supervision, he should remain detained pending his October 27, 2026 jury trial.

### II.  Legal Standard.

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). Danger to the community may consist of the defendant posing a risk to commit economic or financial crimes. *United States v. Zaragoza*, No. CR-08-0083 PJH, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008);[1] *United States v. LeClercq*, No. 07-

---

[1] ("In assessing danger, physical violence is not the only form of danger contemplated by the statute. Danger to the community can be in the form of continued narcotics activity or even encompass pecuniary or economic harm. *United States v. Reynolds*, 956 F.2d 192 (9th Cir.1992). Propensity to commit crime generally may constitute a sufficient risk of danger to come within the act. *See*, *United States v. Karmann*, 471 F.Supp. 1021, 1022 (C.D. Cal 1979).").

80050-CR, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007).[2] The government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant poses a risk of non-appearance. *United States v. Tortora*, 922 F.2d 880, 884 (1st. Cir. 1990); *Motamedi*, 767 F.2d at 1406.

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g). In establishing its case for pretrial detention, the government may proceed by proffer. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986)(citations omitted); *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996)(recognizing circuit consensus that government may proceed by proffer in lieu of presenting live witnesses at pretrial detention hearing brought under Bail Reform Act).

Title 18, United States Code, Section 3145(b) permits a defendant to seek the revocation of a magistrate judge's detention order. In reviewing a magistrate judge's prior order,

---

[2] ("The reference to safety of the community in the Bail Reform Act of 1984 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The [Senate Judiciary] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.' *King*, 849 F.2d at 487 n. 2.").

the "the district court is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist[,]" but it must make its own de novo determination of facts and propriety of the order. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The district court may, however, adopt the same reasoning as the magistrate judge, and is not required to hold an evidentiary hearing on matters that were before the magistrate judge. *Id.*

### III. Because the Defendant Poses a Serious Flight Risk and is a Danger to the Community Pretrial Detention is Warranted.

#### a. Nature and Circumstances of Defendant's Criminal Conduct.

Beginning in or about May 2017, and continuing through at least March 2025, Defendant operated a scheme to file fraudulent tax returns claiming very large, often million-dollar tax refunds based on false federal income tax withholdings. In sum and substance, the scheme was based on filing a Form 1040 individual tax return or Form 1041 trust/estate tax return reporting large phantom Form 1099 federal income tax withholdings. The returns then claim large refunds based on the false withholdings. Bogus Forms 1099 attached to the tax returns falsely report that major banks, online payment platforms like PayPal, and other legitimate businesses made large payments from which large tax withholdings were paid over to the IRS. This type of 1099 false return, sometimes referred to as a 1099-OID or strawman redemption scheme, has been around for decades

3

despite frequent criminal prosecution and IRS efforts to educate the public about the scheme.[3]

Defendant started this eight-year-long scheme by filing false tax returns for himself and several purported trusts that he established solely for purposes of filing the false tax returns. To execute the scheme, Defendant enlisted a co-conspirator, Susana Virrey (Virrey) who was a tax preparer with electronic filing software and an Electronic Filing Identification Number (EFIN) issued by the IRS. He taught Virrey, who had no experience with trust tax returns, how to prepare and file fraudulent Forms 1041 and directed her to file Forms 1041 for his trusts. In June-July 2019, after several unsuccessful attempts using another trust, Defendant was able to

---

[3] *See* Internal Revenue Service, *The Truth About Frivolous Tax Arguments*, *available at* https://www.irs.gov/pub/irs-utl/friv_tax.pdf (accessed August 12, 2025), p.37-38 ("More recently, this redemption theory asserts that persons can draw on the secret or "straw man" Treasury account by sending a Form 1099-OID to a creditor and the creditor can present the form to the Treasury Department and receive full payment of the debt.  The proponents appear to assert that the Form 1099-OID permits them to access their secret Treasury Account for an amount equal to the face amount of the Form 1099-OID in the form of a tax refund.
Proponents of this theory also argue that they have sold or transferred their debt or obligation to the person to whom they issued the Form 1099OID in a transaction subject to sections 1271 through 1275 and that the debt or obligation is transferred with a discount of the full face amount.  The issuer of the Form 1099-OID then treats the face amount of the Form 1099-OID as "other income" on the individual's return.  The "other income" amount, however, is not included in the taxable income line.
Persons asserting this theory often significantly overstate withholding and claim an excessive refund in an amount close or identical to the inflated withholding."); *Marshall v. Florida*, 2010 WL 1248846 (S.D. Fla. Feb 1, 2010) (providing useful explanation of strawman redemption scheme).

cause the IRS to pay out two large refunds based on fraudulent Forms 1041 tax returns filed for his trust, the Bandele Trust. Those fraudulent refunds from the U.S. Treasury Department were $5,709,941 for tax year 2016 and $502,842 for tax year 2017. He then used those fraud proceeds to purchase outright a $1.8 million home in Malibu, California:



He also spent over $200,000 for two Tesla automobiles, one for himself and one for his live-in girlfriend, Patricia Morris a/k/a Sister Modupe (Morris). And he purchased more than half a million dollars in cryptocurrency. After custom painting one of the Teslas orange, his signature color, Defendant made a music

video of himself with the car, flaunting his newfound cryptocurrency wealth:



Encouraged by this successful fraud, and as charged in the Indictment's Counts 10-12, Defendant went on to file a succession of Forms 1041 for Bandele Trust for tax years 2018 and 2019 (twice). But none of those tax returns resulted in the IRS paying out a refund.

While Defendant was filing these false tax returns for himself and his bogus trusts, he was operating the scheme as a kind of business to make money from Forms 1041 he directed Virrey to prepare and caused to be filed for other people. Calling his promotional activity, "Remedy Academy," Defendant pitched these clients (or "students" as he sometimes called them) using a variant of the sovereign citizen strawman

6

redemption scheme. In substance, he told the clients they could use a trust and Form 1041 to access a program established when the U.S. went off the gold standard, obtaining their "credits." He then directed them in the various steps of creating a trust, sending 1099s he supplied to their various creditors, banks, and others, and then ultimately opening a trust bank account into which a tax refund check would be deposited. In those instances where the IRS actually paid out a refund, Defendant demanded a large cut of the refund, often about 10%. In total, Defendant caused at least 17 people (including family members and relatives) to file fraudulent Forms 1041, and, in addition to various fees he charged the clients during preparation of the returns, was able to reap nearly $900,000 in "fees" handed over by the clients from the fraudulent refunds.

The IRS began responding to these false returns by causing banks to freeze $3 million in Defendant's bank accounts and to freeze refund money held in the clients' accounts. In rejecting many of the client returns and a return filed by the Defendant's co-conspirator, Virrey, the IRS sent formal letters notifying that the returns were legally frivolous and subject to civil penalties for fraud. The clients forwarded those letters to Defendant. None of this information stopped Defendant from filing in March 2021 yet another fraudulent Form 1041, this time in the name of a new sham trust, the Brother to Brother Outreach

7

Trust, which requested a $13 million refund based on bogus federal tax withholdings.

On June 3, 2021, the U.S. Attorney's Office filed a civil action seeking forfeiture of the Malibu residence. The complaint was duly served on Defendant and his live-in girlfriend Morris, and outlined the fraudulent nature of the tax return scheme in detail. And as the criminal investigation proceeded, IRS Criminal Investigation (IRS CI) agents obtained a series of seizure warrants allowing the United States to seize the Teslas and cryptocurrency that Defendant bought with the fraudulent refund money. On August 25, 2021, while Defendant and Morris were present, the investigators executed a search warrant at the Malibu residence where they collected extensive evidence of the scheme and seized the two Teslas.[4]

In the ensuing next couple years, Defendant's return filing scheme stalled due to these seizure efforts, the IRS's rejection of his Bandele and Brother to Brother Outreach trust tax returns, and the clients' awareness of the fraud. In addition to filing frivolous lawsuits and legal documents in the forfeiture action, throughout the latter part of 2021 and 2022-2023, Defendant occupied himself with numerous telephone calls to IRS

---

[4] When executed on the exchange holding the cryptocurrency, the seizure warrant resulted in the United States seizing approximately $575,000 in cryptocurrencies including Bitcoin and Ethereum.

customer service numbers seeking the status and processing updates on his false tax returns.

In 2024 Defendant slightly shifted the scheme to filing Form 1040 individual tax returns rather than 1041 trust tax returns. These new returns were still premised on the same false items: phantom Form 1099 withholdings and claims for million-dollar refunds of those false withholdings. In November 2024, Defendant filed by mail with the IRS 2018 and 2019 Forms 1040 for himself. Those returns claimed *hundreds of millions* of dollars in fraudulent refunds based on bogus 1099 tax withholdings.

Defendant followed that up in March 2025 when he filed a tax year 2023 Form 1040 for himself. That return claimed a $3,773,480 refund based on fictitious 1099 withholdings of $6,285,622. The return arrived at that overpayment refund number by inventing $6,285,622 in fictitious interest income and purporting to have paid $2,512,142 in tax on that income via the bogus withholdings. Despite this new iteration of the scheme to file Forms 1040, the IRS did not pay out refunds on any of these new false returns. As recently as July 30, 2025, Defendant was calling IRS customer service to inquire about tax returns.

   **b. Defendant Poses a Serious Risk of Flight Due to His Persistent Disregard of Court Authority, Multiple Passports and Aliases, Lack of Meaningful Employment and Community Ties, Unknown Assets, Extensive International Travel, and Commission of New Criminal Offenses While in Custody in this Case.**

i. Defendant's History of Disobeying and Disregarding Federal Court Orders

Defendant subscribes to sovereign citizen ideology and rejects court authority over his person. The most salient example of this rejection of court authority comes from the civil forfeiture action the United States brought to recover the $1.8 million Malibu house. In that case, *United States v. Real Property Located in Malibu, California*, Case No. 2:21-cv-04569 (C.D. Cal.), Defendant filed a succession of frivolous documents prior to the district court entering judgment forfeiting the property to the United States. The judgment explicitly rejected any claim by Defendant to own the property and stated the property was "forfeited to the United States of America…" *Id.* at ECF 28. Like the complaint detailing Defendant's fraud scheme, the default judgment motion had been duly served on both Defendant and his girlfriend, Morris. *Id.* at 20.

Despite this federal court judgment that he had no claim to the property, Defendant refused to leave, illegally squatting there for years. He did this despite the government's numerous attempts to provide Defendant and Morris formal notice to vacate the property. For instance, on September 18, 2023, IRS CI agents knocked on the door and posted a copy of the judgment and letters to both Defendant and Morris, which advised that they must vacate the premises:



Defendant and Morris refused to vacate the residence. Defendant instead filed a frivolous, handwritten pro se complaint in the Court of Federal Claims, alleging that the IRS agent handling the forfeiture had violated copyright law by using an upper-case rendering of Defendant's name. *Melvin Louis Huges v. United States*, Case No. 1:23-cv-01655-RAH (Fed. Cl.) (complaint filed September 25, 2023).[6] The Court of Federal Claims summarily dismissed that action in December 2023, *id*. at ECF 17; 18. Under the name of her own sham trust, Defendant's girlfriend Morris also filed a bogus handwritten lawsuit in the Court of Federal Claims, which sought to interfere with the

---

[5] This followed an earlier, August 9, 2023, posting of the judgment and letters at the residence.

[6] This fixation on a dual legal personhood symbolized by upper- and lower-case renderings of a name is a staple of sovereign citizen redemption theory ideology. *See Marshall*, *supra*.

forfeiture but would be summarily dismissed in August 2024. *Modupe Trust v. United States*, Case No. 1:23-cv-01640-RTH (Fed. Cl.) (complaint filed September 20, 2023). Defendant and Morris nevertheless continued to illegally occupy the property.

Their illegal occupation ultimately forced the United States to retain private counsel to seek an order of ejectment and restitution in state court. *United States v. Patricia Morris, Melvin Huges, et al.*, Case No. 24SMCV02235 (Cal. Sup. Ct., L.A. Cty.)(complaint filed on May 13, 2024). Around the same time, having already lost the forfeiture and Court of Federal Claims actions, and while illegally squatting at the residence, defendant began targeting the U.S. District Court with frivolous tax-related documents filed in the closed forfeiture action. Specifically, on April 23, 2024, he mailed the Court these Forms 1099-A and 1099-OID, which falsely purport that the Court owes Defendant $16 million:

Case 2:21-cv-04569-JAK-KS    Document 68    Filed 04/29/24    Page 1 of 2   Page ID #:456

A Form 1099-OID (Original Issue Discount) with handwritten entries including:
- PAYER'S name: melvin huges Grantor of Bandele Trust dated April 4th 2018, 23301 w. Pompano Street, Malibu, CA 90265
- Box 1 Original issue discount: $16,00,000.00
- Form 1099-OID (Rev. October 2019), OMB No. 1545-0117, For calendar year 20__
- RECIPIENT'S name: The United States District Court
- Street address: 350 West 1st Street
- City: Los Angeles, CA 90012
- Box 7 Description: court + case 2:21-cv-04569-JAK-KS
- Account number: 2:21-CV-04569-JAK-KS
- RECEIVED 04/29/24, FILED 04/29/2024, Central District of California
- Copy B For Recipient

These frivolous documents were a prelude to Defendant filing another of his fraudulent tax returns.[7] And throughout 2024 and into February 2025, despite being advised repeatedly that the case was closed, Defendant deluged the Court with frivolous documents and correspondence.

It was only the Palisades Fire—not any court order—that caused Defendant to leave the Malibu property when the house was destroyed by fire in January 2025. Even still, Defendant has continued to disregard the Court's order forfeiting the property

---

[7] In a 2023 bankruptcy petition, *In Re Melvin Louis Huges*, Case No. 9:23-bk-11088-RC (Bankr. C.D. Cal.), Defendant, along with falsely averring that he still owned the Malibu property, reported that he was expecting a $16,000,000 tax refund owed to him based on Forms 1041 for 2016 and 2017. *Id.* at ECF 17, p.7.

13

to the United States. In an attempt to get money, the Defendant has disregarded the Court's order and falsely represented that he owns the property. As explained below in addressing Defendant's criminal history, he has fraudulently obtained money from the Federal Emergency Management Agency (FEMA) by claiming to own the property and to be in the process of rebuilding the house. And, along with various other plaintiffs, Defendant and Morris filed a May 2025 lawsuit against the City of Los Angeles falsely alleging that they "lawfully owned [the Malibu property] and suffered damages as a result of the Palisades Fire." *Aston, et al. v. City of Los Angeles, et al.*, Case No. 25STCV13368 (Cal. Sup. Ct., L.A. Cty.) ¶ 44. At the time of the Palisades Fire in January 2025, the Court's forfeiture order was already 15 months old. And the United States' state court ejectment action had been pending for seven months. The IRS had posted notices to vacate in August and September 2023. Defendant was very much aware that he did not own the property and was in fact an unlawful trespasser.

Defendant has also demonstrated a potential to physically resist valid court orders. On the morning of August 25, 2021, IRS CI special agents executed the search warrant at the Malibu property. After initially coming to the door and encountering the agents, Defendant ran back into the house, entered his bedroom, and barricaded himself in the attic. The post-operation report details the effort required to contact Defendant after

14

his initial flight:

> Numerous commands were made to the subject to come down by the agents at the front door. After not complying with agent's [*sic*] commands to come down, the entry team entered the house. After clearing the first 1st [*sic*] floor, agents stacked up and went up the stairs. Agents cleared the 2nd floor and secured the area where subject was last seen running into. Agents took a defensive position around the attic access in the master bedroom closet. Agents repeatedly issued commands for the subject to come down. The subject never responded to any of the agents' commands. At this point, agents reached out to LA Sheriff Deputies that were assisting with outside cover. The deputies reached out to their SWAT team but SWAT was unable to respond. Agents also tried reaching out to FBI's SWAT team but they were also unable to respond.

> At approximately 7:12 AM subject fell through the attic access. Subject initially did not respond to agents' commands to come out of the closet. Subject eventually complied with agents' commands to come out. At this point, subject was handcuffed and brought outside. The site was declared secured.

These facts demonstrate that Defendant has no regard for court orders that contradict his desires to obtain and retain money or property. And they demonstrate that he is willing to flee and resist valid court orders. In conjunction with his sovereign citizen ideology, this history of ignoring and resisting court authority demonstrates he is not amenable to pretrial supervision and instead poses a serious flight risk.

ii. Defendant's Extensive International Travel, Use of Aliases, and Multiple Passports

This palpable risk of flight is further heightened by Defendant's use of aliases, multiple passports, and extensive international travel history. Defendant has used the names

15

Melvin Louis Hughes, Melvin Lewis Hughes, and Melvin Louis Huges. Defendant has obtained U.S. passports issued to both Melvin Louis Hughes and Melvin Louis Huges. He has obtained a birth certificate in the name Melvin Louis Huges. According to travel records he also has used the name Melvin Louis Pratoff.[8] And a criminal history record reflects aliases of Terry L. Palmer and Melvin Kenny Hughes. He also typically uses the monicker Bandele or Bandele El.

Defendant has traveled extensively to other international locations. He has traveled multiple times to both El Salvador (because of its active cryptocurrency scene) and Ghana, which he has visited by transiting through European countries. Travel records indicate he has traveled internationally as recently as March and June of 2025.

When Defendant was initially interviewed by Pretrial Services, he failed to disclose that, in addition to being a United States citizen, he had also obtained Ghanaian citizenship. He also failed to disclose that he had previously been issued and used a Ghanaian passport to travel internationally. Here is the passport Defendant failed to tell the Court about and which indicates his Ghanaian nationality:

---

[8] Pratoff is potentially be a maternal surname and is the surname for one of the relatives for whom Defendant caused a false tax return to be filed.





Defendant's concealment of these facts and the flight risk they demonstrate are not countered by evidence that he may have also had his U.S. passport stamped in Ghana when he visited there in April 2025. It is unknown whether Defendant has obtained a new Ghanaian passport. No pretrial supervision condition could

17

prevent Defendant from fleeing the United States, obtaining a new passport at a Ghanaian embassy in a third country, and permanently absconding from justice.

      iii. <u>Defendant's Lack of Employment, Income Sources, Verifiable Assets, or Financial Ties to the Community</u>

While Defendant has resided in Los Angeles County for a lengthy period, he does not have the kind of attachments that help mitigate flight risk. He is unemployed and does not appear to have any legitimate source of income. In his 2023 bankruptcy petition, Defendant stated he was unemployed and had no source of current monthly income. *In Re Melvin Louis Huges*, ECF 12-13. He does not file tax returns, much less report any income. More recently, in a July 28, 2025 document sent to FEMA, Defendant stated under penalty of perjury that he has "zero income":

---

**INCOME STATEMENT LETTER**

Post Disaster I melvin I huges, I'm writing this statement to declare that I have zero income. "I hereby declare under penalty of perjury the foregoing is true and correct."

*Melvin L Huges*  7/29/2025

Melvin L Huges  date 7/28/2025

FEMA # 63-8425040

LASS 4 OF SS ████

**CERTIFIED TO BE A TRUE COPY OF THE ORIGINAL**

---

Other than holding himself out on social media as a cryptocurrency proselytizer and aficionado, he does not appear

to have acquired any employment or livelihood. He also does not possess any of the material attachments to a district that would discourage flight, such as real property, vehicles, or domestic financial accounts with significant balances.

Any assets the Defendant controls appear to consist of cryptocurrency he failed to disclose to the Court during his initial detention proceedings. On August 22, 2025, Defendant represented to Pretrial Services that "he has no cash and no money in any bank accounts" and that "he had 16 bitcoins, which were taken by the IRS." However, while detained at MDC, Defendant has made recorded calls to his girlfriend Morris and his daughter Tamika Boswell (Boswell), his proposed third-party custodian, which indicate those statements were false.[9] In an August 28, 2025, call with Boswell, Defendant told her that he has sixteen Bitcoin that he "saved [] for my grandbabies," and he is doing everything he can to get to the Bitcoin. This was after Ms. Boswell asked Defendant why he could not just sign the Bitcoin over to her.

Calls between Defendant and Morris during the period August 25, 2025, through August 31, 2025, are replete with what appears to be the two trying to engineer Morris's access to various Bitcoin wallets that Defendant controlled. In thinly-veiled code

[9] These calls have been produced to the defense in discovery and are available for the Court's review if requested.

19

language, Defendant and Ms. Morris discussed cryptocurrency accounts and the need to figure out "how to liquify[*sic*]." During one of the calls, Defendant told Morris she "can send from x to v... should be able to add an account to v" and he talked about "addresses" and instant transfers and said "it's available right away." In one of the calls Morris mentioned a "wallet" and the two discussed sending things to different addresses. Defendant's emails with Ms. Morris further corroborate that Defendant has undisclosed Bitcoin that he has been attempting to access:

FROM: 26721506 HUGHES, MELVIN
TO: "Patricia Morris" <morrpres7@protonmail.com>
SUBJECT: Greetings
DATE: 08/30/2025 09:49 AM

Greetings Queen,
Please drive  to Mina's house.
She don't answer her phone
After transfer from Ex B address  to V  the instant transfer to your B account on V everything will be available right away.
 write check for Terry.
What's the current price of B right now.

These calls and email clearly show that Defendant had access to cryptocurrency and/or other accounts he has not disclosed to Pretrial Services. This new evidence furnishes even more reason to consider Defendant an extreme flight risk.

    iv. <u>Defendant's Lack of Meaningful Familial Ties and Appropriate Third-Party Custodians</u>

Defendant also lacks the kind of familial ties to a district that might mitigate flight risk. His closest association appears to be his girlfriend, Ms. Morris, who is a codefendant in the civil ejectment action relating to the Malibu property. In June 2020, Defendant purported to deed the property

into a trust, the Modupe Trust, for which she was the sole trustee. This transfer occurred several months after the IRS's Frivolous Return Program began sending letters to Defendant's clients advising them that the tax returns they filed were frivolous, as well as after IRS revoked his co-conspirator Virrey's electronic filing privileges. Defendant also attempted to organize an offshore Cook Islands trust in the name of Bandele Trust with Morris as one of the two beneficiaries (Defendant's adult son being the other).[10] As detailed above, Morris has been an active participant in Defendant's illegal occupation of the Malibu property. Moreover, Morris was also the driver of one of the Teslas that Defendant purchased with the fraudulent refund money. As noted, she further abetted his scheme by filing a frivolous lawsuit designed to prevent forfeiture of the Malibu property. She is in no way the type of third-party custodian that would mitigate the risks Defendant poses if released.

Elsewhere, Defendant has duped and enlisted his family members into participating in his fraudulent tax refund scheme. The Indictment's Count 17 involves a fraudulent tax return that

---

[10] Defendant's adult son is not a viable third-party custodian for Defendant's pretrial release. According to a criminal history report, the son has an extensive criminal history, including convictions for assault, a weapons offense, numerous drug and paraphernalia possession offenses, carrying a concealed firearm without a permit, larceny, theft, and hit and run. Additionally, as a person for whom Defendant caused a false trust tax return to be filed, Defendant's son is not an appropriate custodian.

21

Defendant caused a family member to file, and which resulted in the IRS paying out a $2.2 million refund from which Defendant received $286,996. Similarly, Count 19 involves a fraudulent tax return that Defendant convinced a second family member to file, although the IRS did not end up paying out a refund. Additionally, the Indictment's Count 15 involves a false tax return filed for a trust created in the name of Defendant's ex-wife. Although not charged in a substantive count, Defendant also caused his own adult son to file a fraudulent tax return as a part of the scheme.

Defendant also involved his proposed third-party custodian, his daughter, Boswell, in the scheme by sending her some proceeds he derived from the fraud and listing her as a beneficiary for his sham fraudulent trusts. Although not a witting participant in Defendant's criminal activity, Boswell received outright a small amount of the fraud proceeds from Defendant[11] and was designated as a beneficiary of an offshore trust Defendant tried to create to hold his fraud proceeds. She was also a named beneficiary of the fraudulent trust that Defendant used to obtain almost $6 million in fraudulent IRS refunds, the Bandele Trust:

---

[11] On November 4, 2019, shortly after receiving millions in fraudulent refund money, Defendant transferred $5,000 to Ms. Boswell. He sent her another $1,000 on December 4, 2020.

22

**ARTICLE IV**

DEATH OF THE TRUSTOR

(A)  DISTRIBUTIONS AND DISBURSEMENTS

Upon the death of the Trustor, and after the payment of the Trustor's just debts, funeral expenses and expenses of last illness, and the disbursements listed in Article III of this Trust, the following distributions shall be made: Huges,Melvin Louis.

(B)  DEATH OF BENEFICIARY BEFORE COMPLETE DISTRIBUTION OF TRUST ASSETS

(1) In the event the Beneficiary dies before a complete distribution of his Trust is made, then their share shall go to: Jamelvin A Huges, Tamika Boswell, Mira Boswell, Jacob Boswell, Donte Huges, Patricia Morris,

Similarly, Boswell is also one of the named beneficiaries for another of the trusts Defendant used to file fraudulent tax returns seeking millions in refunds, the Brother to Brother Outreach Trust:

(A)  DISTRIBUTIONS AND DISBURSEMENTS

Upon the death of the Trustor, and after the payment of the Trustor's just debts, funeral expenses and expenses of last illness, and the disbursements listed in Article III of this Trust, the following distributions shall be made Melvin, Huges.

(B)  DEATH OF BENEFICIARY BEFORE COMPLETE DISTRIBUTION OF TRUST ASSETS

(1) In the event the Beneficiary dies before a complete distribution of his Trust is made, then their share shall go to: Jamelvin Hughes, Tamika Powell, Patricia Morris

She therefore remains unsuitable as a custodian or bail resource.

As discussed above, Boswell is also not a suitable custodian given her discussions with Defendant about the cryptocurrency assets he failed to disclose to Pretrial Services. Moreover, Boswell's conversations with Defendant about cryptocurrency are particularly concerning in relation to the

23

residence that Boswell and her husband are willing to put up for security for a $60,000 appearance bond. On March 25, 2025, Boswell's mortgage lender filed a notice of default on the property. According to a public records search, on October 6, 2025, less than two months after Defendant's August 2025 jail calls with Boswell and Morris about cryptocurrency, the lender filed a notice of rescission eliminating the notice of default. Any relationship between these events is unknown at this point but warrants further inquiry as to whether Defendant arranged for his cryptocurrency to be liquidated and, in an effort to obtain his release, used the proceeds to pay Ms. Boswell's residence out of default. Ms. Boswell's willingness to only permit the property to be used as security for up to $60,000 of its equity raises further concern.

Because Defendant has treated his family members as tools or beneficiaries of his criminal scheme, his familial ties actually enhance the risk of flight, belie the existence of a valid third-party custodian, and increase the risk of non-compliance with pretrial supervision.

### c. Defendant Poses a Significant Risk of Witness Dissuasion and Obstruction if Released.

During the course of this investigation, Defendant has engaged in several acts showing he poses a risk of witness dissuasion or obstruction. When Defendant and his clients' bank accounts started being frozen due to the fraudulent tax refunds,

he encouraged his clients to take steps to undermine those efforts and also to begin communicating with him via encrypted means. For instance, in this text message exchange with the client involved in the Indictment's Count 13, he encouraged the client to begin filing similar returns using a different trust, bank, and electronic tax return filing platform:





Clients also reported Defendant trying to convince them to begin communicating with him via the Switzerland-based encrypted email service Protonmail and the encrypted messaging service WhatsApp. For instance, the client involved in the Indictment's Count 13 related the following conversation with Defendant after the client's bank account was frozen:

> …And now I'm really getting upset because when this whole thing happened, I didn't really think there was much but he only… now he only wants to talk on WhatsApp, and then he told me I have to go get Proton Mail because in order for him to fix it he needs to send it in a special email because… Now it's all making sense to me. It is not right. And I was like, "Well, you need to send it to my email." And he's like "No, I don't wanna talk on that account. We have to be smart about this." So, at this point I'm just over it.

This conduct further shows that Defendant poses a serious flight

risk and is not susceptible to meaningful pretrial supervision. And it shows he poses the danger of witness dissuasion and obstruction if released.

### d. The Evidence of Defendant's Guilt is Overwhelming, and the Sentencing Guidelines Recommend a Lengthy Term of Imprisonment.

As detailed in the description of the offense conduct underlying the indictment there is a very strong likelihood of conviction at trial. While the weight of the evidence is the least important factor when weighing pretrial detention or release, *Motamedi*, 767 F.2d at 1408, it clearly supports detention in this case. The government has assembled extensive evidence demonstrating that Defendant filed or caused to be filed dozens of fraudulent tax returns. This evidence includes numerous recorded or sworn witness statements identifying him as the source of the fraudulent items on the returns and the beneficiary of the illegally-obtained tax refunds. It also includes numerous pieces of evidence preventing Defendant from claiming he believed in good faith that the returns were lawful. For instance, in this February 2020 email Defendant forwarded to his co-conspirator, Virrey, a letter from the IRS's Frivolous Return Program, which advised that one of the client returns was frivolous, fraudulent, and without any legal basis:

27

From: REMEDY ACADEMY <remedyacademy999@gmail.com>
To: ███████████████████████████████
Subject: A███████ █████████████
Date: Tue, 04 Feb 2020 12:09:02 -0800
Attachments: FRIVILOUS_FILING_CORRECTED_.pdf

And even after receiving several of these letters, having his bank account frozen, having his ill-gotten purchases seized and forfeited by federal district court orders, Defendant continued to file numerous fraudulent tax returns demanding millions of dollars in refunds based on fictitious withholdings. Indeed, after all that, as recently as March 2025, he mailed one of these fraudulent tax returns to an IRS office in Austin, Texas. Simply put, the evidence of Defendant's guilt is overwhelming.

Putting aside Defendant's criminal history (detailed below) and the intended loss involved in his offenses (which would approach or exceed $1 billion), the Sentencing Guidelines recommend a very lengthy term of imprisonment after conviction at trial. Without the benefit of a Pre-Sentence Investigation Report, the government's preliminary calculation consists of the following:

| Offense Level Calculation | | USSG |
|---|---|---|
| Base Offense | 7 | §§ 2B1.1(a)(1) |
| Offense Characteristics | +20 | § 2B1.1(b)(1)(K) |

28

| | | |
|---|---|---|
| • Loss Greater than $9.5 Million, Less than $25 Million | | |
| Chapter 3 Adjustments<br>• Aggravating Role (+2)<br>• Obstruction (+2) | +4 | § 3B1.1(c)<br>§ 3C1.1 |
| **Total Combined Adjusted Offense Level** | **31** | |

Disregarding Defendant's extensive criminal history, the Sentencing Guidelines call for a 108-135 month prison sentence for an offender with no criminal history. This factor supports detention and further evidences the serious flight risk Defendant poses.

### e. Defendant's Unrelated Criminal History is Serious, Extensive, and Continuous.

According to the government's review of Defendant's criminal history record, his first adult criminal conviction occurred in 1981 when he was convicted of Aggravated Burglary in Louisiana and later sentenced to a seven-year prison sentence. After being released, he sustained a 1990 arrest and conviction for Flight/Escape in Georgia, serving a 14-day jail term. The criminal history record indicates he was arrested again in 1996 for a probation violation. And in 1997 he was again arrested in Georgia for Financial Transaction Card Theft, Forgery, and Theft by Deception although the disposition of those charges is unknown but likely does not include convictions.

In 2002, he was arrested in Pierce County, Washington for Child Molestation and later convicted in 2003 of a gross

misdemeanor offense, Communicating with a Minor for Immoral Purposes. He appears to have been placed on probation. The docket entries for that case indicate multiple petitions for revocation of Defendant's probation and that he was arrested and returned on a bench warrant. The docket appears to show that the court terminated Defendant's probation after the bench warrant return.

On March 18, 2003, Defendant was arrested in Washington State for Assault, which appears to have involved interference with a flight crew. The disposition of that offense is unclear from the record, but the arrest would have occurred after he was charged in the child molestation case and shortly after he pleaded guilty and was released on conditions of supervision.

On July 8, 2003, while on probation for the sex offense case mentioned above, he was again arrested in Washington State, this time for a fraud scheme. At a 2004 trial, a jury found Defendant guilty of committing five counts of first-degree theft by deception and one count of forgery. *See State v. Hughes*, 130 Wash. App. 1014 (2005). In that criminal scheme, Defendant operated a purported real estate business, Entrepreneur Enterprises, which he used to swindle prospective buyers out of real estate downpayments by falsely claiming to own certain properties. *See generally id.* The sentencing outcome in that case is unknown, but the convictions were affirmed on appeal.

30

In 2007 Defendant was arrested for Failure to Register as a Sex Offender, a gross misdemeanor. And in 2009 he was arrested in Tacoma, Washington and convicted of misdemeanor Resisting Arrest, receiving a 90-day jail sentence.

There is a substantial temporal gap between the known commencement of the fraud scheme charged in the Indictment, which began around May 2017, and this criminal history. Defendant's past criminal conduct nevertheless illustrates that he has spent much of his life being arrested for and convicted of different types of serious crimes. It further shows that the fraud scheme charged in the Indictment is not Defendant's first criminally prosecuted fraud scheme. Moreover, Defendant's fraudulent behavior has only increased in sophistication and severity, graduating from stealing $5,000 and $10,000 downpayments from would be homebuyers to stealing $13 million from the United States Treasury. This criminal history provides more compelling proof that Defendant poses a serious flight risk if not detained pending trial. It also illustrates his past failures to abide by court-imposed supervision and to refrain from picking up new criminal arrests after being released on supervision in a pending criminal case.

Finally, the government has obtained information showing that Defendant has fraudulently obtained federal disaster funds from FEMA. Since the Palisades Fire destroyed the Malibu residence purchased with the fraudulent tax refunds, Defendant

31

has submitted extensive application materials for federal disaster relief. In total, Defendant has received $72,599.77 in FEMA funds, a large component of which is $43,000 to rebuild or replace a destroyed home.[12] Defendant has also sought and received thousands of dollars in rental assistance.

To receive or continue receiving FEMA assistance, an applicant is required to make certain material representations as to their efforts to find replacement housing or repair/rebuild a disaster-damaged home. Upon signing the application under penalty of perjury, the applicant is advised it is a violation of several criminal statutes to submit false claims or make false statements in the application, including Section 287, a crime charged in this Indictment.

In Defendant's application materials, he falsely represented that he owned the Malibu residence and owned it at the time of the fire:

---

[12] This total figure includes $13,125 in temporary housing assistance and another $15,874.77 in Other Needs Assistance (ONA), which is financial aid for necessary and serious living expenses that are not covered by insurance or other sources. It is unclear whether, as an unlawful trespasser, Defendant qualified for these other forms of aid.

32

**10. PERMANENT HOUSING PLAN**

☐ I was RENTING my home at the time of the disaster and my permanent housing plan is to:

   ☐ Return to my pre-disaster rental unit

   ☐ Move into a new rental unit within my budget

   ☐ Move in with family/friends    Projected move in date:

☑ I OWNED my home at the time of the disaster and my permanent housing plan is to:

☑ Repair or rebuild my disaster-damaged home

☑ Build a new home at my disaster-damaged home address or at a new site

☐ Purchase a different home

☐ Become a renter and find a rental property within my budget

☐ Move in with family/friends    Projected move in date: 7/7/2027

**CERTIFIED TO BE A TRUE COPY OF THE ORIGINAL**

Further, to induce FEMA to pay him money, Defendant falsely represented that he owned the property and had commenced rebuilding it:

> I, Melvin Huges L., FEMA Case Number 63-8425040, am the owner of the property located at 23301 West Pompano St., Malibu, California, 90265. This property was destroyed in the recent fire disaster.
>
> I hereby state that the process to rebuild my home at this address has commenced. Based on current assessments, planning, permitting, and construction timelines, I estimate that the complete rebuilding of the home will require approximately 14 months from the start date.
>
> This timeframe accounts for all necessary phases including debris removal, architectural design, permit approvals, construction, inspections, and final occupancy. I respectfully submit this statement to document the ongoing recovery efforts and anticipated timeline for the restoration of my residence.
>
> Signed,
>
> *Melvin Huges L*
>
> Melvin Huges L.
>
> Date: 6/19/2025

These false representations were material since FEMA would not have paid the $43,000 in housing replacement costs unless Defendant supplied a declaration stating that he owned the property and had a plan to rebuild or had commenced rebuilding

the property.[13] That condition is immediately above language warning applicants of the criminal consequences of false claims and statements and also where Defendant signed the application under penalty of perjury:

The following applies only if you **owned** your disaster-damaged home and have decided to repair it:

- I have a plan to repair or have started repairing my disaster-damaged home. and I intend to move back into it when the repairs are complete.

**11. DECLARATION**

NOTE: If you intentionally make false statements or hide information in order to receive disaster assistance, it is a violation of federal and state laws. This may carry severe criminal and civil penalties. Penalties may include a fine up to $250,000, imprisonment, or both (18 U.S.C § 287, 1001, and 3571).

**I declare under penalty of perjury that the information I provided above is true and correct.**

_Melvin Huges /_
Applicant or Co-Applicant Signature                          Date 6/18/2025

Thus, consistent with his history of engaging in different fraud schemes, Defendant fraudulently obtained money to rebuild a residence he did not and does not own. Defendant's misrepresentation that he had commenced the process of rebuilding the property is also a lie told under penalty of perjury. Indeed, on August 12, 2025, investigators visited the site and did not observe any rebuilding activity, as documented in this and other photographs:

---

[13] If Defendant had a legitimate plan to build replacement housing at a different location or site that would have also sufficed to obtain the funds.

34



An August 14, 2025, search of the L.A. County database for building permits did not show any recent rebuilding permits obtained for the property.[14] Defendant would not, in any event, have any legal right to perform rebuilding on this property forfeited to the United States. Just as he stole money from the U.S. Treasury by submitting false tax returns, Defendant stole money from the Treasury by submitting false claims to FEMA.

But that is not even the extent of his attempts to steal FEMA disaster funds. Even after Defendant was detained in this case, he continued to attempt to defraud FEMA while in custody at MDC. In a September 2, 2025, recorded jail call, Defendant discussed with his girlfriend Morris how to continue obtaining

---

[14] https://epicla.lacounty.gov/energov_prod/SelfService/#/search?m=2&ps=10&pn=1&em=true&st=23301%20w.%20pompano (accessed August 14, 2025).

funds from FEMA while he is detained. During that call, Defendant told Morris, FEMA "won't know I'm here" and asked Ms. Morris to call FEMA while on the line with Defendant and to merge the call so Defendant could speak to FEMA. Defendant told Ms. Morris that FEMA "won't know the difference" if he is in jail – "they would have no way of knowing that I'm calling from... ." On September 4, 2025, Defendant and Ms. Morris followed through on their plan to contact FEMA in a three-way call. Once on the line with the FEMA representative, Defendant talked about continued rental assistance. When the FEMA operator asked him "where are you currently staying at the moment," Defendant responded, "it's a lease agreement, West Pompano." Defendant did not disclose to FEMA that he is actually in jail. These efforts to continue carrying on this fraud with the assistance of Morris strongly confirm that Defendant should remain detained.[15, 16]

**f. Defendant's High Blood Pressure Does Not Warrant Releasing Him From Custody.**

In a bid to bolster his claim for release from pretrial detention, Defendant has attempted to use his high blood pressure as a reason for being released from custody. In the

---

[15] Prior to trial, the government intends to obtain a superseding indictment charging Defendant with additional criminal offenses based on defrauding FEMA.

[16] The MDC calls also show that Defendant has no qualms about disregarding MDC rules for inmate behavior. While the MDC call system expressly advises that sharing inmate PAC numbers is prohibited, Defendant has permitted at least two other inmates to use his PAC number to make unauthorized calls. Defendant's inability to follow basic rules even while in custody demonstrates that he is not amenable to supervision.

36

proceedings before the U.S. Magistrate Judge, Defendant presented medical records related to his April 27, 2026 evaluation for elevated blood pressure. On that date, Defendant was transported from the Bureau of Prisons' MDC to the emergency department at Adventist Health White Memorial Hospital. Once there, Defendant was diagnosed with elevated blood pressure and an abnormal electrocardiogram (EKG) result. Against the physician's advice, Defendant nevertheless refused to receive treatment for the condition and declined further diagnostic studies or blood draws.

The notes from that evaluation reflect that Defendant did not seem particularly concerned with his blood pressure condition but was primarily concerned with obtaining access to "tribal remedies" unavailable to him at MDC and also creating records for purposes of his bid to obtain pretrial release:

> 62-year-old male, brought in by officers from prison for evaluation of elevated blood pressure. He states that he has been in custody since August of last year. He has been denied access to his tribal remedies for his elevated blood pressure. He says that he has been told that he has elevated blood pressure before, and when he takes his "remedies" it does control his blood pressure. He states that he has been unable to access that since he has been in custody which is probably why his blood pressure is elevated. He states that his attorney is working on a bail proceeding now in order to allow him to recheck his tribal remedies. He states that he feels fine. He has no headache, no chest pain, no shortness of breath. He states that he has no symptoms right now, but he would like to have documentation that he has not been able to access his remedies. He has no other complaints at this time.

While potentially serious, high blood pressure is a very common health condition among inmate populations. Indeed, according to a Bureau of Justice Statistics study, it is the

37

most commonly reported chronic health problem among federal and state inmates. *See* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Survey of Prison Inmates, 2016, Medical Problems Reported by Prisoners.[17] Accordingly, due to the prevalence of the problem among inmate populations, the Bureau of Prisons (BOP) has established a robust clinical protocol for management of the problem. *See* Federal Bureau of Prisons, *Clinical Practice Guidelines: Management of Hypertension*, May 18, 2015.[18]

There is no reason to believe Defendant has been denied treatment for his elevated blood pressure while detained at MDC. Indeed, based on the excerpt above, it appears he has actively *avoided* treatment for his condition and instead now uses it as a pretextual justification for being released from custody. Because Defendant's condition can be adequately addressed while he remains in custody pending his October 27, 2026 trial, it does not furnish a basis for his release.

/ / /

/ / /

/ / /

---

[17] *Available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/mprpspi16st.pdf (accessed June 15, 2026).

[18] *Available at* https://www.bop.gov/resources/pdfs/hypertension_2015.pdf (accessed June 15, 2026).

**IV. Conclusion.**

Based on the foregoing, the government requests that the Defendant continue to be detained as a serious flight risk and danger to the community.

```
                              TODD BLANCHE
                              Acting Attorney General
                              BILAL A. ESSAYLI
                              First Assistant United States
                              Attorney


                              _____/s/_____

                              PATRICK BURNS
                              MAHANA K. WEIDLER
                              Trial Attorneys
                              Criminal Division, Tax Section
                              United States Department of
                              Justice

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA
```